The PEOPLE of the State of
Colorado, Complainant,

v.

Michael A. VARALLO, Respondent.

Nos. 02PDJ045, 02PDJ057.

Office of the Presiding Disciplinary Judge
of the Supreme Court of Colorado.

Dec. 20, 2002.

Opinion issued by a Hearing Board consisting of the Presiding Disciplinary Judge ROGER L. KEITHLEY and Hearing Board Members CORINNE MARTINEZ–CASIAS and BARBARA WEIL LAFF, both members of the bar of the State of Colorado.

## REPORT, DECISION AND IMPOSITION OF SANCTION

*SANCTION IMPOSED: ATTORNEY DISBARRED*

A sanctions hearing pursuant to C.R.C.P. 251.15(b) was held on December 19, 2002, before a Hearing Board consisting of the Presiding Disciplinary Judge ("PDJ") and two Hearing Board Members, Corinne Martinez–Casias and Barbara Weil Laff, both members of the bar. James C. Coyle, Deputy Regulation Counsel, represented the People of the State of Colorado ("People"). Michael A. Varallo, the respondent, ("respondent") appeared *pro se.*

The People filed a complaint in this matter on June 5, 2002. The respondent failed to answer in a timely fashion and on July 16, 2002, the People filed a motion for default. The respondent subsequently filed a two paragraph answer and requested an extension of time to file an amended Answer. The respondent's motion was granted to and including August 6, 2002. The respondent failed to file an amended answer to the Complaint.

An at-issue conference occurred on August 28, 2002. The respondent appeared and participated. At that time, the court entered discovery deadlines and other trial management deadlines, including an order that the parties use alternative dispute resolution or mediation to discuss resolution of the matter.

Initial disclosures were due on or before September 17, 2002. The respondent failed to provide initial disclosures. The People filed a motion for order compelling discovery on October 3, 2002. Respondent was ordered to respond on or before October 14, 2002. The respondent failed to file a response. On October 18, 2002, the court ordered that the respondent provide initial disclosures to counsel for the People on or before October 28, 2002; the respondent failed to do so. On October 30, 2002 the People filed a motion for sanctions. This motion for sanctions was granted on November 20, 2002, and respondent was precluded from introducing any evidence at trial except his own testimony in mitigation and cross-examination of witnesses.

In the interim, and on October 7, 2002 the People filed a motion for leave to file amended complaint. That motion was granted on November 1, 2002. The People filed an amended Complaint on November 4, 2002. Pursuant to C.R.C.P. 15(a), the respondent had ten days to file an Answer to the amended Complaint. The respondent failed to file an Answer. On November 20, 2002, the People filed a motion for default. The respondent did not respond.

On December 2, 2002 the pre-trial conference in the above-entitled matter occurred. Despite having received sufficient notice of the conference, respondent failed to appear. On December 9, 2002, the PDJ granted the People's motion for default as to the facts set forth in the amended complaint, which were deemed admitted, and as to the claims set forth in the amended complaint, which were deemed established. The PDJ directed that the hearing scheduled for December 19–20, 2002, become a sanctions hearing on one day only, December 19, 2002. Copies of the PDJ's order re: default were sent to the respondent at his registered business address.

At the Sanctions Hearing, the People presented and the PDJ admitted exhibits 1, 2 and 3. Respondent appeared and testified regarding mitigation and aggravation. The Hearing Board considered the exhibits, the facts established by the entry of default, respondent's testimony, the argument of the parties, and made the following findings of facts which were established by clear and convincing evidence.

## I. FINDINGS OF FACT

Michael A. Varallo has taken and subscribed the oath of admission, was admitted to the bar of the Colorado Supreme Court on October 14, 1999 and is registered upon the official records of the Supreme Court, registration number 31100. He is subject to the jurisdiction of this court pursuant to C.R.C.P. 251.1(b).

The October 14, 1999 admission to the Colorado Bar was the respondent's second admission. The respondent was first licensed to practice law in Colorado in 1973. The respondent then engaged in conduct involving knowing conversion of client funds, resulting in his disbarment effective May 22, 1993. *See People v. Varallo*, 913 P.2d 1, 12 (Colo.1996). The Colorado Supreme Court terminated Varallo's disbarment effective December 31, 1998. The respondent passed the February 1999 Colorado Bar Examination, applied for readmission and thus obtained this second license to practice law in Colorado.

All factual allegations set forth in the amended Complaint were deemed admitted by the entry of default, and therefore are established by clear and convincing evidence. *See* Exhibit "1". The entry of default also deemed established the violations of the Rules of Professional Conduct set forth therein, except for Colo. RPC 1.15(a) (claim five), which was pled as an alternative claim.

## II. CONCLUSIONS OF LAW

The order entering default against Varallo established that in the Sargsyan/Idinyan matter, Varallo violated Colo. RPC 1.1 (a lawyer shall provide competent representation to a client), Colo. RPC 1.3 (a lawyer shall act with reasonable diligence and promptness in representing a client and shall not neglect a legal matter entrusted to that lawyer), Colo. RPC 1.4(a) (a lawyer shall keep a client reasonably informed about the status of a matter, and promptly comply with reasonable requests for information), Colo. RPC 1.4(b) (a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation), Colo. RPC 8.4(c) (knowing conversion of client funds), Colo. RPC 3.4(c) (a lawyer shall not knowingly disobey an obligation under the rules of a tribunal), Colo. RPC 8.4(d) (a lawyer shall not engage in conduct that is prejudicial to administration of justice), and Colo. RPC 3.3(a)(1) (a lawyer shall not knowingly make a false statement of material fact or law to a tribunal). In the Dougherty–Trentlage matter, the respondent violated Colo. RPC 1.3 (a lawyer shall act with reasonable diligence and promptness in representing a client and shall not neglect a legal matter entrusted to that lawyer) and Colo. RPC 1.4(a)(a lawyer shall keep a client reasonably informed about the status of a matter, and promptly comply with reasonable requests for information).

A review of the individual matters reveals the extent of Varallo's misconduct. In the Sargsyan/Idinyan matter, Varallo agreed to represent six members of an Armenian family facing removal from this country, each client having different immigration issues and defenses. Varallo received a retainer of $1,000 for such representation. While Varallo deposited the retainer into his COLTAF account, prior to earning the deposited funds, he withdrew some of these client funds and exercised dominion and control over the funds without the consent of the clients.

Varallo was well aware of his obligations in the handling of client funds as he had previously been disbarred for knowing conversion of client funds and had been required as a prerequisite to readmission to establish that he understood the absolute necessity to keep client funds in trust until earned. *See Varallo v. People*, 35 P.3d 177, 180–181 (Colo. 1999).[1]

---

1. The conditions upon Varallo's readmission included submitting quarterly reconciliation reports of both his operating and trust accounts reflecting each and every deposit and withdrawal from such accounts to the Office of Attorney Regulation Counsel for a period of 3 years, and fully cooperating with the Office of Attorney Regulation Counsel in explaining and submitting requested detail contained in such reports. Additionally, during the first thirty-six months of Varallo's readmission, he was prohibited from practicing as a solo practitioner; any trust account over which Varallo had signature authority required the signature of a second attorney

Varallo engaged in a pattern and practice of incompetence, neglect, and failure to communicate with these clients, and ultimately abandoned these clients in their immigration matters. The most severe examples of his misconduct involved Varallo's failing to make adequate inquiry into, and analysis of, the substantive and procedural aspects of removal, asylum and marriage fraud proceedings in these clients' matters, by failing to advise one family member (who was married to an American citizen) of the opportunity to file an I–130 petition, by failing to advise that same family member of the opportunity for filing an I–360 petition (as a result of her first marriage to another American citizen), by failing to notify his clients of the court ordered deadline for application for political asylum, by failing to notify the clients of an upcoming removal hearing, by failing to personally appear for that hearing despite a prior court order requiring him to do so, by failing to notify his clients of the judge's order of removal, and by failing to advise his clients of the deadlines for filing an appeal or motion to reopen.

The immigration court ordered Varallo to personally appear at the February 27, 2001 hearing. The respondent knowingly disobeyed this order when he failed to personally appear and instead chose to appear by telephone. Such failure to attend this hearing prejudiced his clients and interfered with the procedures and the function of the immigration court.

Varallo also knowingly made a false statement of material fact to the immigration court after the court had entered orders of removal when he stated on the record that he was going to withdraw and had attempted to find new counsel for the family, but had difficulty scheduling a time when he, the new attorney and the family could meet. Varallo had made no effort to secure counsel, had made no effort to schedule a meeting, and had never told the family of his intentions to withdraw. The respondent knew these statements were not true at the time he made them to the court. These statements were

made to deceive the court as to the level and extent of his failures to complete his professional tasks and to deceive the court on his clients' lack of knowledge of the status of their proceedings.

In the Dougherty–Trentlage matter, Varallo represented a client in post dissolution proceedings. Varallo had agreed to prepare a qualified domestic relations order ("QDRO") on behalf of this client on January 17, 2001. Nevertheless, Varallo failed to communicate with the client over an extended period of months and neglected the client's matter, ultimately failing to prepare the QDRO on behalf of the client, or otherwise notify the client that he would not finish the QDRO.

In both cases, Varallo's misconduct caused and exposed his clients to serious injury.

### III.  SANCTION/IMPOSITION OF DISICIPLINE

The ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards* ") is the guiding authority for selecting the appropriate sanction to impose for this lawyer's misconduct. ABA *Standard* 4.11 provides that disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

ABA *Standard* 4.41 provides that disbarment is generally appropriate when:

(a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or

(b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or

(c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious of potentially serious injury to a client.

ABA *Standard* 4.51 provides that disbarment is generally appropriate when a law-

---

who had full and complete access to the documentation justifying such withdrawals to effectuate a withdrawal, and he was to secure the services of an independent accounting service to

maintain the financial records of his law practice and make all records available to the Office of Attorney Regulation Counsel upon request.

yer's course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client.

By his acts and omissions, Varallo abandoned the Sargsyan/Idinyan clients with the result that these clients had no effective representation during the course of their removal and marriage fraud proceedings. To establish abandonment rather than merely neglect, there must be proof that the attorney—during a given time period—was required to accomplish specific professional tasks for the client, failed to accomplish those tasks, and failed to communicate with the client. *People v. Scruggs*, 52 P.3d 237 (Colo. O.P.D.J.2002). The proof must objectively indicate that the attorney has deserted, rejected and/or relinquished the professional responsibilities owed to the clients. *Id.* The totality of facts here establish that the respondent deserted, rejected and/or relinquished the professional responsibilities he owed to the Sargsyan/Idinyan family and therefore abandoned them. The presumed sanction for conversion and abandonment of an attorney's clients is disbarment. *See People v. Lenahan*, 52 P.3d 247 (Colo.O.P.D.J. 2002) (attorney disbarred, *inter alia*, for abandonment of client matters); *People v. Scruggs*, *supra* (attorney disbarred, *inter alia*, for knowing conversion and abandonment of client matters).

In addition, the presumed sanction for conversion of client funds alone is disbarment. *See People v. Katz*, 58 P.3d 1176, 1195 (Colo.O.P.D.J.2002); *People v. Varallo*, 913 P.2d 1 (Colo.1996).

In this case, however, there is a third basis for disbarment. Varallo knowingly made a misstatement of material fact to a court in order to conceal his neglect of client matters. *See People v. Kolbjornsen*, 35 P.3d 181 (Colo. O.P.D.J.1999); *People v. Espinoza*, 35 P.3d 552 (Colo.O.P.D.J.2001) and *People v. Roose*, 44 P.3d 266 (Colo.O.P.D.J.2002).

Pursuant to ABA *Standards* 9.22 and 9.32, respectively, aggravating and mitigating factors were considered in arriving at the appropriate sanction. At the sanctions hearing, respondent acknowledged that he made mistakes in the immigration cases due to his failing to calendar deadlines. He did not express remorse for his actions. Respondent's testimony with regard to mitigation was not credible, accordingly, no factors in mitigation were considered.

In aggravation, Varallo has a prior disciplinary record, considered an aggravating factor pursuant to ABA *Standards* 9.22(a); he had a dishonest or selfish motive, *see id.* at 9.22(b); he demonstrated a pattern of misconduct, *see id.* at 9.22(c); he engaged in multiple offenses, *see id.* at 9.22(d); he did not cooperate in this proceeding and thereby engaged in bad faith obstruction in the disciplinary proceeding, *see id.* at 9.22(e); he refused to acknowledge the wrongful nature of the conduct, *see id.* at 9.22(g); his clients were exceptionally vulnerable, depending on respondent to protect their abilities to reside in the United States, *see id.* at 9.22(h); and respondent has had substantial experience in the practice of law, *see id.* at 9.22(i).

Varallo's knowing conversion of client funds, abandonment, intentional deception of his clients, false statements of material fact to the immigration court, and other instances of failure to communicate, neglect, abandonment, and failure to participate in this proceeding result in the conclusion that disbarment is required.

## IV.   ORDER

It is therefore ORDERED:

1.   MICHAEL A. VARALLO, attorney registration 31100, is DISBARRED from the practice of law effective thirty-one days from the date of this order. His name shall be stricken from the roll of attorneys licensed to practice law in the State of Colorado.

2.   Michael A. Varallo is Ordered to pay the costs of these proceedings; the People shall submit a Statement of Costs within ten (10) days of the date of this Order. Respondent shall have five (5) days thereafter to submit a response thereto.

### EXHIBIT "1"

### AMENDED COMPLAINT

THIS COMPLAINT is filed pursuant to the authority of C.R.C.P. 251.9 through 251.14, and it is alleged as follows:

## *Jurisdiction*

1. The respondent has taken and subscribed the oath of admission, was admitted to the bar of this court on October 14, 1999, and is registered upon the official records of this court, registration no. 31100. He is subject to the jurisdiction of this court in these disciplinary proceedings. The respondent's registered business address is 1817 Ninth Street, Greeley, Colorado 80631.

## *THE SARGSYAN/IDINYAN MATTER*

2. Ruben Sargsyan and Susan Idinyan are Armenian citizens.[2] The Sargsyan/Idinyan family (hereinafter referred to as "Sargsyan family" or "Sargsyans") has four children (two daughters and two sons). One of the daughters is named Nvart.

3. In the 1990's, Nvart married an American named Vaughn Huckfeldt in Armenia. Mr. Huckfeldt lived in the same town as the Sargsyan family in Armenia.

4. Upon information and belief, Mr. Huckfeldt counseled local townspeople on methods to emigrate to the United States; Mr. Huckfeldt collected large fees from these residents in exchange for his promised assistance in helping them emigrate to the United States.

5. Mr. Huckfeldt then left Armenia with Nvart and returned to the United States. Upon information and belief, Mr. Huckfeldt told his "clients" that they were to contact the Sargsyans regarding their eventual emigration to the United States. The Sargsyans had no knowledge of Mr. Huckfeldt's "business" with these individuals until after Mr. Huckfeldt left the country.

6. Once the other townspeople learned that Mr. Huckfeldt had left Armenia with their money, they approached and blamed the Sargsyans. Ruben Sargsyan was severely beaten. In addition, threats were made to have the two Sargsyan sons killed unless the Sargsyans restored the funds collected by Huckfeldt.

7. The Sargsyans sold their home and personal property and took out a loan in an effort to partially pay some of the affected individuals.

8. Eventually, the Sargsyans were able to flee Armenia after Mr. Huckfeldt arranged for Mr. Sargsyan to receive a U.S. student visa. The family arrived in the United States on or about January 30, 1999.

9. Nvart's and the family's relationship with Mr. Huckfeldt soon deteriorated. Mr. Huckfeldt had been abusive to Nvart and their newborn son, Joseph. Mr. Huckfeldt and Nvart were divorced in December 1999.

10. Shortly thereafter, Mr. Huckfeldt reported the Sargsyan family to the U.S. Immigration & Naturalization Service ("INS") in Dallas, Texas. Huckfeldt later filed a marriage fraud claim with the INS against Nvart. The Sargsyan family, including Nvart, were all thereafter subject to removal proceedings before the U.S. Immigration Court in Texas.

11. On January 12, 2000, an immigration agent in Dallas, Texas, issued separate notices to appear to Ruben Sargsyan, and the children (Meri, Gevorg and Hayk) to an incorrect address provided by Huckfeldt; the Sargsyan family therefore did not appear at the initial hearing. The mother, Susan, did not receive any notice to appear. Nvart only learned of the removal proceedings when she traveled to the Denver INS office in March 2000 to try to obtain a work permit.

12. On May 16, 2000, the Immigration Court in Dallas, Texas issued separate notices in removal proceedings to the Sargsyan family, setting a master hearing in Dallas on June 20, 2000. The notices were sent to the Sargsyan family's correct address in Colorado.

13. Nvart retained the respondent in May 2000 to represent her family in their removal proceedings and to represent her in her marriage fraud case. An attorney-client relationship was thus formed between the respondent and all members of the Sargsyan family, including Nvart (hereinafter collectively referred to as "the clients").

14. Nvart stressed to the respondent in their initial meeting that the removal case

---

**2.** In Armenia, the women retain the mother's surname.

was the most important of the two matters, given the substantial risk of removal and family members' life endangerment if they were required to return to Armenia. Nvart informed the respondent of all those facts recited in paragraphs 2–12 hereinabove, and provided the respondent with psychological reports and documentary evidence of Mr. Huckfeldt's abusive nature.

15. On May 22, 2000, Nvart's current husband, Lloyd Noland, wrote a check in the amount of $1000 to the respondent. The respondent deposited the check into his COLTAF account on May 25, 2000.

16. The respondent incorrectly advised Nvart and Lloyd that the Sargsyan family should not apply for asylum, despite their stated belief that the Sargsyans would face probable death if they were removed and sent back to Armenia. The respondent also failed to recognize that spousal abuse by an American citizen could provide Nvart with legal remedies under immigration law and the Violence Against Women Act ("VAWA").

17. On May 31, 2000, the respondent appeared with Nvart in the marriage fraud matter in the immigration court in Denver. The court set a master hearing for August 9, 2000 at 9:30 a.m. with the respondent's consent.

18. The respondent advised Nvart that the Sargsyan family would have to attend their master hearing set for June 20, 2000 in Dallas, Texas. Relying on the respondent's advice, the entire family traveled to Dallas, and then learned that the respondent only needed to move for a change of venue. The judge ordered that venue be changed to Denver.

19. On June 23, 2000, the Immigration Court in Denver scheduled a master hearing for September 7, 2000 for the Sargsyans. Nvart faxed a copy of the notice to the respondent on June 29, 2000. The facsimile was received by the respondent's office.

20. On June 29, 2000, Nvart also sent a letter to the respondent requesting application forms for asylum. The respondent received the letter, but did not respond.

21. Pursuant to the respondent's billing records, the respondent spent 4.0 hours in May 2000 on the Sargsyan matters and then spent no other time until August 9, 2000. The respondent's billing rate was $150 per hour; therefore, the total amount of time spent, and total amount of money earned, by the respondent in May through July 2000 was $600.

22. On July 10, 2000, the respondent's balance in his COLTAF account dipped to $223.27, which is below the $400 of the Sargsyan trust funds that the respondent should have maintained in his trust account.

23. On August 9, 2000, Nvart was present at her marriage fraud hearing with the respondent; the respondent told the court that he had not "sorted the case out procedurally" at that point. The judge asked the respondent if Lloyd had filed an I–130 petition for Nvart, and the respondent replied that he had not. Nvart's marriage fraud and removal case was set for an evidentiary hearing on January 29, 2001 at 1:00 p.m.

24. Despite having known that Nvart was now married to an American and despite the fact that the court had intimated that an I–130 petition could be filed by Lloyd on Nvart's behalf, the respondent failed to advise them to do so and took no other action in this regard. Despite having been provided with psychological reports and other evidence that established spousal abuse by Mr. Huckfeldt and against Nvart, the respondent failed to recognize the possibility of filing an I–360 self-petition pursuant to VAWA.

25. On September 7, 2000, Nvart, Lloyd and the Sargsyans drove from their home in Ridgway to Denver to attend the master hearing for the removal matters. The respondent failed to appear. The respondent did not notify his clients beforehand that he would not appear at the master hearing. Lloyd requested a continuance based upon the absence of counsel, which was granted.

26. On September 7, 2000, the immigration court issued a notice of hearing in removal proceedings in the Sargsyans' case, which set the continued master hearing for October 19, 2000. Lloyd sent the respondent a copy of the notice of hearing as the respon-

dent had not yet filed a written entry of appearance. The respondent received this notice.

27. On October 19, 2000, the immigration court issued a notice of hearing in the Sargsyans' removal case. A master hearing was set for January 29, 2001, based upon a statement from the respondent that he would move to consolidate Nvart's and the Sargsyans' cases. The Judge wrote "Respondents [Sargsyans] excused. Counsel must appear. Mr. Sargsyan must be by the phone." The notice was sent to the respondent as well as the Sargsyans. The respondent received this notice.

28. On October 23, 2000, the respondent filed separate entries of appearance with the Immigration Court on behalf of Ruben, Meri, Gevorg and Hayk Sargsyan. This was his first written appearance in their cases. The respondent took no action on behalf of Susan. The respondent failed to recognize or address the legal ramifications of not amending the proceedings to include Susan. These ramifications included, but were not limited to, a potential permanent bar to any subsequent application for asylum by Susan.

29. On November 2, 2000, Judge J.P. Vandello issued a minute order in the Sargsyans' case, stating that the respondent had requested but then failed to file a motion for the consolidation of the clients' cases. The judge therefore ruled that the cases would not be consolidated; the judge thus reset the Sargsyans' cases for hearing on December 7, 2000. He excused the Sargsyans from attending the hearing, but ordered one of them to be waiting by the telephone. Nvart's hearing was still set for January 29, 2001.

30. The court issued separate notices that a master hearing in each of the Sargsyans' cases was set for December 7, 2000. The notices were sent to, and received by, the respondent as he was now counsel of record.

31. The respondent failed to notify his clients of the court notices, or of the December 7, 2000 hearing.

32. On December 7, 2000, the respondent appeared telephonically before the immigration court without the knowledge of the Sargsyans. The respondent admitted the charges against the family without having fully discussed the admission to the charges, or the legal effect of such admissions to the charges, with the family. The respondent told the judge that the Sargsyan family was going to seek asylum. On that date, the court ordered a deadline of February 27, 2001 for the filing of any application for asylum (Form I–589) to be filed with the INS. The court also set a merits hearing for February 27, 2001. The court ruled that the family could be present by telephone. The court directed the respondent to prepare two applications for political asylum—one for Ruben and his sons and another for Meri, who was an adult. The judge specifically ordered that the respondent was to be present at the hearing with the prepared asylum applications on February 27, and that since he was giving the respondent two months, he would grant no more extensions. A notice of hearing was sent to and received by the respondent.

33. The respondent failed to inform the family of the February 27, 2001 hearing or the deadline for asylum applications. The respondent also failed to address or discuss the legal issues involving Susan Idinyan. In addition, the respondent did not prepare the asylum applications.

34. On December 28, 2000, the Assistant District Counsel for the INS filed a motion to submit proposed exhibits for Nvart's hearing on January 29, 2001. Copies of the motion and exhibits had been mailed to the respondent on December 26, 2000. The respondent failed to forward the documents to Nvart and filed nothing in response.

35. Nvart attempted to contact the respondent many times after October, 2000, but the respondent failed to return her calls. The last thing he told her was that all family members were to be by the telephone on January 29, 2001 for the next master hearing. It was Nvart's understanding that her case had been consolidated with the Sargsyans' removal matters, and that the judge had acknowledged the hardship on the family to travel to Denver and allowed them to be present by telephone. She did not know that she had to be present at her hearing on

January 29, 2001 or face removal because the respondent had not advised her accordingly. She was also not made aware of the severe consequences of losing her proceedings, including being statutorily barred from proceeding under an I–130 or an I–360 petition in the future.

36. On January 25, 2001, the Assistant District Counsel for the INS mailed copies of additional exhibits for Nvart's January 29 hearing to the respondent. The respondent received these documents. The respondent did not send copies of those documents to Nvart.

37. On January 29, 2001, the Sargsyans and Nvart gathered around the telephone at 1:00 p.m., the scheduled hearing time. Based on the respondent's representations, they reasonably believed that the respondent would be attending the hearing on their behalf. The respondent called the Sargsyans at approximately 2:00 p.m. and said that the court had not made a decision. Approximately ten minutes later, the respondent called back and said the court had continued the hearing but that he did not know the new hearing date. The respondent did not mention to his clients the deadline for the Sargsyans' applications for asylum or the February 27 hearing in their case.

38. On January 30, 2001 in Nvart's case, the immigration court issued a notice of hearing, which set an individual hearing on August 8, 2001. Notice was sent to, and received by, the respondent. Pursuant to a notation made on his copy, the respondent did not send the notice to Nvart until June 11, 2001.

39. On February 27, 2001, the respondent appeared by telephone in connection with the Sargsyans' case, in violation of the earlier court order requiring his personal appearance. With the respondent on the telephone, the judge entered orders of removal for the Sargsyans. The court then advised the respondent of the deadlines for an appeal (30 days) and for a motion to reopen (90 days).

40. The respondent stated on the record at the February 27, 2001 hearing that he was going to withdraw and had attempted to find new counsel for the family, but had had difficulty scheduling a time when he, the new attorney and the family could meet. This statement was not true. The respondent had made no attempt to notify the clients of the need to secure new counsel and had never told the family of his intentions to withdraw. The respondent knew these statements were not true at the time he made the statements. The statements were an attempt by this respondent to deceive the court on the level and extent of his neglect in failing to represent their interests in their removal proceedings. These statements were material in nature.

41. Despite the fact that the judge ordered the removal of the Sargsyans to Armenia and informed the respondent of the deadlines for appeal and to reopen, the respondent did nothing. The respondent failed to file the appeal, and failed to file a motion to reopen. The respondent also did not withdraw.

42. The respondent did not notify his clients of the court's order of removal, of the deadlines for appeal, and of the deadlines for motions to reopen. The respondent also did not notify his clients of his intent to withdraw from representing them. Nor did the respondent notify the Sargsyans of his neglect of their matter.

43. On about May 17, 2001, each Sargsyan family member received a certified envelope from the INS containing a notice stating that they were deportable and ordering them to arrange for their departure to Armenia. They were instructed to report to the INS office in Denver on June 7, 2001 ready for deportation. The Sargsyans were horrified by the prospect of returning to Armenia where a number of people had threatened their family members' lives.

44. Nvart attempted to contact the respondent on several occasions. The respondent did not return her calls.

45. Nvart eventually got in contact with the respondent in June 2001. The respondent told her at that time that he had "not been paid enough" on these matters and that he no longer handled immigration cases.

46. On about June 8, 2001, the family retained new counsel, Sandra Saltrese Miller, who had them execute applications for asylum and for withholding of removal. Shortly thereafter, Ms. Saltrese Miller filed a motion to reopen on behalf of the Sargsyans alleging ineffective assistance of counsel on the part of the respondent. She also filed for an emergency administrative stay of deportation on behalf of the family. Ms. Saltrese Miller has also been attempting to assist Susan Idinyan from being deported, despite the tolling of the statute of limitation on her ability to file for any relief.

47. On June 11, 2001, the respondent filed a motion to withdraw in Nvart's case. The judge denied the motion because it did not set forth an address for service of Nvart that corresponded with the records of the court. It also did not advise Nvart of the next scheduled appearance.

48. Also on June 11, 2001, the respondent sent Nvart a check for $1,000 written on his operating account. That check was returned due to insufficient funds. Nvart's bank charged her $30 for the returned item. Later, the respondent obtained a cashier's check for $1,000 and sent it to Nvart. That check cleared.

49. On July 2, 2001, the immigration judge granted the Sargsyans' motion to reopen filed by subsequent attorney Sandra Saltrese Miller. The Sargsyans (except for Susan) had a master/individual hearing in the removal matters on August 20, 2002. Orders of removal were again entered. These orders are now under appeal. Nvart has been cleared in the marriage fraud action, and can now proceed with her attempt to adjust her status pursuant to I–130 and/or I–360 applications. Attorney Saltrese Miller is also attempting to fashion legal recourse for Susan Idinyan, who is now ineligible to file for asylum.

### CLAIM I

### (A Lawyer Shall Provide Competent Representation To A Client– Colo. RPC 1.1)

50. Paragraphs 1 through 49 are incorporated herein as if fully set forth.

51. Colo. RPC 1.1 requires that a lawyer shall provide competent representation to a client, and that competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

52. The respondent failed to provide his clients competent legal representation:

a. by advising them in May 2000 that they were not eligible for application for asylum after failing to first make adequate inquiry into and analysis of the appropriateness of such advice;

b. by failing to file a motion for change of venue and instead instructing the Sargsyans that they had to appear at a June 20, 2000 hearing in Dallas, Texas without having first made adequate inquiry and analysis into the appropriateness of such advice;

c. by failing to prepare an I–130 petition, or have Lloyd file an I–130 petition based upon Nvart's current marital status, despite intimations by the immigration court that such action should be taken, and by failing to prepare an I–360 petition;

d. by failing to make adequate inquiry into and analysis of the substantive and procedural aspects of removal, asylum and marriage fraud proceedings in the clients' (including Susan's) matters, and failing to become qualified to provide legal representation in these matters;

e. by failing to make adequate inquiry into and analysis of the factual circumstances involved in the clients' matters in order to properly safeguard their interests during the course of their removal and marriage fraud proceedings;

f. by failing to associate with a lawyer competent in immigration matters, or in the alternative, by failing to timely decline representation of these clients in these immigration matters;

g. by remaining the attorney of record for these clients despite lacking the necessary knowledge, skill, thoroughness and preparation reasonably necessary for such representation;

h. by admitting the charges against the clients without having inquired into and analyzed the appropriateness of such ad-

mission made without client knowledge or consent; and

    i.  by abandoning these clients' interests by neither filing asylum applications nor notifying the clients of the court's direction in that regard, by failing to seek additional relief on behalf of Nvart or any relief on behalf of Susan, by failing to personally appear at the February 27, 2001 hearing and failing to timely notify the clients that they should be present at such hearing, by failing to notify the clients of the order of removal entered on that date, by failing to file an appeal or motion to reopen within the statutory deadlines, and by allowing these clients to be subject to removal without having exercised a minimal level of competence expected of an attorney under the same circumstances.

Each of these failures by the respondent constitutes a separate incident of failure to provide competent legal representation, as do all of them together.

53.  The respondent knew or should have known that he was failing to provide competent legal representation to these clients, but made no effort to remedy the situation.

54.  The respondent's failure to provide competent legal representation to these clients caused serious or potentially serious injury to these clients.

55.  The foregoing conduct of the respondent in failing to provide competent legal representation to these clients establishes grounds for discipline as provided in C.R.C.P. 251.5 and also violates Colo. RPC 1.1.

WHEREFORE, the complainant prays at the conclusion hereof.

### CLAIM II

**(A Lawyer Shall Act With Reasonable Diligence And Promptness In Representing A Client And Shall Not Neglect A Legal Matter Entrusted To That Lawyer–Colo. RPC 1.3)**

56.  Paragraphs 1 through 49 are incorporated herein as if fully set forth.

57.  Colo. RPC 1.3 provides that a lawyer shall act with reasonable diligence and promptness in representing a client, and that a lawyer shall not neglect a legal matter entrusted to that lawyer.

58.  The respondent failed to act with reasonable diligence and promptness and neglected the clients' legal matters in each of the following respects:

    a.  by failing to inquire into and analyze adequately the factual and legal elements of the clients' immigration matters, and failing to adequately advise them of immigration procedures in their first meetings;

    b.  by failing to study and investigate these client matters adequately prior to advising Nvart and Lloyd that the Sargsyans were not eligible for asylum;

    c.  by failing to move for a change of venue in the removal proceedings that had been set in Dallas, Texas;

    d.  by continuing to fail to research, study and investigate adequately his clients' legal matters during the time that master hearings were taking place;

    e.  by failing to file an I–130 petition on Nvart's behalf, even after being instructed by the court to do so, and by failing to file an I–360 petition on Nvart's behalf;

    f.  by continuing to fail to advise his clients properly and adequately on their legal matters to the extent reasonably necessary to permit those clients to make informed decisions regarding their representation;

    g.  by failing to appear at the September 7, 2000 master hearing in the removal proceedings;

    h.  by failing to file a written entry of appearance on behalf of the Sargsyans in the removal matters until October 2000;

    i.  by failing to file a motion to consolidate all of the client matters even after the respondent had already informed the court that he would do so;

    j.  by failing to notify his clients of the court notices for the December 7, 2000 hearing;

    k.  by admitting the charges against the clients in the removal proceedings without

having fully discussed such action with these clients;

l. by failing to prepare asylum applications on behalf of these clients (including Susan) even after having been given clear notice by the court that there would be no extensions after February 27, 2001;

m. by failing to inform the clients of the February 27, 2001 evidentiary hearing or the deadline for asylum applications;

n. by failing to file proposed exhibits for the January 29, 2001 marriage fraud hearing;

o. by failing to forward the INS proposed exhibits to the client for the January 29, 2001, hearing;

p. by failing to advise the clients of their legal rights and duties in the immigration matters during the critical time periods of December 2000, January 2001 and February 2001;

q. by failing to notify Nvart that she had to be physically present at the January 29, 2001 hearing in order to avoid the possibility of removal;

r. by failing to inform the Sargsyans that they would be allowed to be present at the February 27, 2001 hearing by telephone, and by failing to inform them of the court's order that the respondent had to be physically present for said hearing;

s. by failing to appear at the January 29, 2001 hearing, and by failing to advise the clients truthfully that he would not and did not appear for such hearing;

t. by failing to notify Nvart that the marriage fraud hearing had been rescheduled to August 8, 2000 (until the respondent moved to withdraw from the case on June 11, 2001);

u. by failing to comply with the court order that the respondent physically appear for the February 27, 2001 hearing;

v. by failing to notify the clients of the orders for removal entered on February 27, 2001, and of their right to file an appeal within thirty days, and of their right to file a motion to reopen within ninety days;

w. by failing to file a notice of appeal within the statutory deadline of thirty days;

x. by failing to file a motion to reopen within the statutory deadline of ninety days;

y. by failing to inform the court that his clients were unaware of the February 27, 2001 hearing prior to the entry of the order of removal;

z. by failing to withdraw from these clients' matters despite the fact that the respondent had so severely and grossly neglected them; and

aa. by failing to keep the family adequately informed as to the status of their legal matter throughout these proceedings. Each of these failures by the respondent constitutes a separate incident of lack of diligence and promptness, and/or neglect, as do all of them together.

59. The respondent knew or should have known that his lack of diligence and promptness, and/or neglect continued to occur over a period of months and involved a pattern and practice of lack of diligence and promptness, and/or neglect.

60. The respondent's lack of diligence and promptness, and/or neglect caused serious or potentially serious injury to these clients.

61. The respondent's pattern and practice of failing to accomplish his professional tasks for these clients constitutes abandonment of the professional responsibilities owed to these clients.

62. The foregoing conduct of the respondent establishes grounds for discipline as provided in C.R.C.P. 251.5, and also violates Colo. RPC 1.3.

WHEREFORE, the complainant prays at the conclusion hereof.

## II. CLAIM III

**(A Lawyer Shall Keep A Client Reasonably Informed About The Status Of A Matter, Promptly Comply With Reasonable Requests For Information, And Explain A Matter To The Extent Reasonably Necessary To Permit The Client To Make Informed Decisions Regarding The Representation–Colo. RPC 1.4(a) and (b))**

63. Paragraphs 1 through 49 are incorporated herein as if fully set forth.

64. Colo. RPC 1.4(a) provides that a lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

65. This respondent failed to keep the clients reasonably informed about the status of their legal matters and failed to comply promptly with reasonable requests for information in the following respects:

a. by failing to respond to Nvart's request for forms to seek asylum;

b. by failing to advise Nvart of the opportunity for Lloyd to file an I–130 petition and the possible legal effects of failing to do so, and by failing to advise Nvart of the opportunity for filing an I–360 petition;

c. by failing to advise the clients of his intent to file motions to consolidate their cases and of the possible legal effects of his failure to so;

d. by failing to inform the clients of the court notices on the December 7, 2000 master hearing;

e. by failing to advise the clients of the possible legal effect of his admission to the charges against the clients at the December 7 hearing and of the possible legal effects of such admission;

f. by failing to notify the clients of the court ordered deadline of February 27, 2001 for the application for political asylum and failure to advise the clients (including Susan)of the possible legal effects of failing to file said applications;

g. by failing to notify the clients of the February 27, 2001 hearing, and of the requirement that the respondent personally appear for that hearing, and of the ruling that the family could be present by telephone, and of the possible legal effects of failing to abide by that court order;

h. by failing to advise Nvart of the proposed exhibits in the January 29, 2001 and February 27, 2001 hearing, and failing to notify the clients of the respondent's failure to file proposed exhibits on their behalf and the possible legal effects of such failures;

i. by failing to respond to reasonable requests for information made by the family between October 2000 and January 2001;

j. by failing to notify Nvart that she had to be physically present at the marriage fraud hearing on January 29, 2001 or of the possible legal effects, including removal, for such failure to appear;

k. by failing to notify the clients of the respondent's failure to appear at the September 7, 2000 hearing and the January 29, 2001 hearing, and of the possible legal effects of his failures to appear;

l. by failing to advise the clients accurately as to the status of their cases when he spoke with them on January 29, 2001;

m. by failing to notify Nvart (until June 11, 2001) of her individual hearing on the marriage fraud case, set for August 8, 2001;

n. by failing to notify the family of the judge's orders of removal in their cases;

o. by failing to advise the clients of the opportunity and deadline for filing an appeal of the orders of removal;

p. by failing to notify the clients of the opportunity and deadline for filing a motion to reopen their cases;

q. by failing to notify the clients of his stated intention (to the court) that he "was going to withdraw and had attempted to find new counsel for this family;"

r. by failing to notify the family of the potential effects of his neglect in not filing an appeal, a motion to reopen, or a motion to withdraw;

s. by failing to return Nvart's telephone calls after the clients received notice on May 17, 2001 that they were deportable and that they should arrange for their departure to Armenia;

t. by failing to inform the clients fully and promptly of any other material developments in their matters;

u. by failing to examine the clients' legal affairs adequately, and report about them to the clients;

v. and by failing to maintain minimum communications with the clients throughout the course of the representation.

Each of these failures to communicate adequately with these clients constitutes a separate violation of Colo. RPC 1.4(a) as do all of them together.

66. The respondent knew or should have known that he had failed to communicate adequately with his clients over an extended period of months.

67. The respondent's pattern and practice of failing to communicate with his clients caused serious or potentially serious injury to these clients.

68. The respondent's failure to communicate on these matters constitutes abandonment of the professional responsibilities owed to these clients.

69. Colo. RPC 1.4(b) provides that a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

70. The respondent failed to explain to these clients the matters in which they were involved to the extent reasonably necessary to permit them to make informed decisions in the following respects:

    a. by failing to explain sufficiently their legal rights and obligations in the removal proceedings, the marriage fraud action, and possible asylum proceedings, and explain the practical implications therein;

    b. and by failing to inform the clients fully and promptly of material developments in their matters to permit them to make informed decisions regarding the representation.

Each of these failures to explain constitutes a separate violation of Colo. RPC 1.4(b) as do both of them together.

71. The respondent knew or should have known that he failed to adequately explain these legal matters to these clients over an extended period of months.

72. The respondent's pattern and practice of failing to explain these legal matters to these clients caused serious or potentially serious injury to these clients.

73. The respondent's failure to adequately explain these clients' matters constitutes abandonment of the professional responsibilities owed to these clients.

74. The foregoing conduct of the respondent establishes grounds for discipline as provided in C.R.C.P. 251.5, and violates Colo. RPC 1.4(a) and (b).

WHEREFORE, the complainant prays at the conclusion hereof.

### III. CLAIM IV

**(A Lawyer Shall Not Engage In Conduct Involving Dishonesty, Fraud, Deceit Or Misrepresentation (Knowing Conversion)-Colo. RPC 8.4(c))**

75. Paragraphs 1 through 49 are incorporated herein as if fully set forth.

76. Colo. RPC 8.4(c) provides that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

77. Commencing on July 10, 2000 the balance in the respondent's trust account dipped below the amount of funds that should have been held in trust on behalf of the clients. This dip resulted from the respondent's conduct in writing checks or withdrawing funds from the trust account for purposes other than for the Sargsyan clients during that time period.

78. The respondent exercised dominion and ownership over funds held in trust on behalf of these clients.

79. The respondent did not have the consent of the clients or Mr. Noland to use the clients' funds for his own purposes, or any other purpose other than these clients' purpose.

80. The respondent was well aware of his obligations in the handling of client funds as he had previously been disbarred for knowing conversion of client funds (*People v. Varallo*, 913 P.2d 1 (Colo.1996)), and had been required as a prerequisite to readmission to establish that he had been rehabilitated and fit to practice law (*Varallo v. People*, 35 P.3d 177 (Colo.O.P.D.J.1999)).[3]

---

3. In the readmission opinion, the court stated:

"Varallo's disbarment was based on financial

81. Through his unauthorized exercise of dominion or ownership over client funds as described above, the respondent knowingly converted or misappropriated funds belonging to his clients.

82. Through his knowing conversion or misappropriation of client funds, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation.

83. The foregoing conduct of the respondent establishes grounds for discipline as provided in C.R.C.P. 251.5, and also violates Colo. RPC 8.4(c).

WHEREFORE, the complainant prays at the conclusion hereof.

## IV. CLAIM V

### (Alternative Claim of Negligent Or Technical Conversion– Colo. RPC 1.15(a))

84. Paragraphs 1 through 49 are incorporated herein as if fully set forth.

85. Colo. RPC 1.15(a) provides that an attorney is required to hold the property of clients or third persons that is in an attorney's possession separate from the attorney's own property.

86. By allowing his COLTAF trust account to dip below the amount of client funds that the respondent was required to have kept in trust, the respondent converted and/or misappropriated such client funds prior to the them being earned.

87. By removing these funds from the trust account, the respondent failed to hold the client property in trust. The respondent did not have the consent of the client or Mr. Noland to keep said funds elsewhere.

88. The foregoing conduct of the respondent establishes grounds for discipline as provided in C.R.C.P. 251.5, and also violates Colo. RPC 1.15(a).

issues. Varallo's experiences during the period of his disbarment firmly established the necessity of conducting the finances of a law practice with the utmost attention to ethical considerations. He identified several practices followed by his

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM VI

### (A Lawyer Shall Not Knowingly Disobey An Obligation Under The Rules Of A Tribunal–Colo. RPC 3.4(c))

89. Paragraphs 1 through 49 are incorporated herein as if fully set forth.

90. Colo. RPC 3.4(c) provides that a lawyer shall not knowingly disobey an obligation under the rules of a tribunal.

91. The respondent knowingly disobeyed a court order by failing to attend the February 27, 2001 hearing when specifically ordered to do so.

92. No exception exists under Colo. RPC 3.4(c) for the respondent's knowing failure to attend the hearing.

93. The foregoing conduct of the respondent establishes grounds for discipline as provided in C.R.C.P. 251.5, and also violates Colo. RPC 3.4(c).

WHEREFORE, the complainant prays at the conclusion hereof.

## CLAIM VII

### (A Lawyer Shall Not Engage In Conduct That Is Prejudicial To The Administration Of Justice–Colo. RPC 8.4(d))

94. Paragraphs 1 through 49 are incorporated herein as if fully set forth.

95. Colo. RPC 8.4(d) provides that it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

96. By failing to attend a hearing when ordered by the court to do so, the respondent acted in contravention of the court's authority.

97. Such failure to attend interfered with the ebb and flow of the procedures and the function of the court.

supervising attorney which he intends to implement in order to prevent any possibility of a recurrence of his earlier misconduct." *See Varallo* at 179.

98. The foregoing conduct of the respondent establishes grounds for discipline as provided in C.R.C.P. 251.5, and violates Colo. RPC 8.4(d).

WHEREFORE, the complainant prays at the conclusion hereof.

### V. CLAIM VIII

**(A Lawyer Shall Not Knowingly Make A False Statement Of Material Fact Or Law To A Tribunal–Colo. RPC 3.3(a)(1)).**

99. Paragraphs 1 through 49 are incorporated herein as if fully set forth.

100. Colo. RPC 3.3(a)(1) provides that a lawyer shall not knowingly make a false statement of material fact to a tribunal.

101. On February 27, 2001, the court entered orders of removal for the clients because no application for asylum had been filed on their behalf. The court also advised the respondent of the deadlines for an appeal and the motion to reopen.

102. At that time the respondent stated on the record that he was going to withdraw and had attempted to find new counsel for the family, but had had difficulty scheduling a time when he, the new attorney and the family could meet.

103. The above statements by this respondent were not true. The respondent had made no attempt to secure counsel, had made no effort to schedule a meeting, and had never told the family of his intentions to withdraw.

104. The respondent knew that the above statements were not true at the time that he made the statements.

105. The respondent's statements were an attempt by this attorney to deceive the court on the level and extent of his failures to complete his professional tasks and to deceive the court on his clients' lack of knowledge of the status of their proceedings.

106. The respondent's false statements were of a material fact.

107. The foregoing conduct of the respondent establishes grounds for discipline as provided in C.R.C.P. 251.5 and also violates Colo. RPC 3.3(a)(1).

WHEREFORE, the complainant prays at the conclusion hereof.

### THE DOUGHERTY–TRENTLAGE MATTER

108. Tracy Dougherty–Trentlage hired Greeley attorney Robert Ray to represent her in a dissolution of marriage action. The respondent had been Mr. Ray's legal assistant while under an order of disbarment. *See People v. Varallo*, 913 P.2d 1 (Colo.1996).

109. During the course of attorney Ray's representation in the *Dougherty* matter, the respondent was the primary, if not exclusive, contact with Ms. Dougherty–Trentlage. The separation agreement was entered into and filed on September 20, 1999. The decree of dissolution was also entered on September 20, 1999.

110. Pursuant to the separation agreement, a qualified domestic relations order ("QDRO") was to be prepared by the attorney for Ms. Dougherty–Trentlage. C.R.S. § 14–10–113 provides that such QDRO should be prepared and submitted to the plan administrator within ninety days after entry of decree and the permanent orders.

111. The respondent was readmitted to the practice of law effective October 6, 1999. The respondent left attorney Ray's office shortly thereafter. Ms. Dougherty–Trentlage remained a client of attorney Ray.

112. Attorney Ray did not complete the QDRO on Ms. Dougherty–Trentlage's behalf.

113. On January 17, 2001, Ms. Dougherty–Trentlage hired the respondent to finish the QDRO and handle another post-dissolution matter. Ms. Dougherty–Trentlage and the respondent entered into an attorney-client relationship.

114. The respondent agreed that he would prepare the QDRO. The respondent also agreed that he would also represent Ms. Dougherty–Trentlage on a potential request for modification of permanent orders that the ex-husband intended to file.

115. The respondent reviewed an already-prepared draft of the QDRO as well as

the court-approved separation agreement on January 17, 2001.

116. On January 29, 2001, the respondent had an office conference with the client. At that conference, the respondent informed Ms. Dougherty–Trentlage that he was working on the QDRO. In addition, the respondent prepared a response to a motion for modification and enforcement of parenting time and child support issues that was filed by the ex-husband on January 24, 2001. On that same date, the respondent drafted a motion for mediation (regarding the parenting time and child support issues).

117. The respondent and the client met briefly on February 2, 2001. At the time, Ms. Dougherty–Trentlage paid the respondent his requested retainer of $500. At that time, the respondent assured his client that he would finish the QDRO.

118. On February 2, 2001, the respondent filed a motion for substitution of counsel, whereby the respondent entered his appearance as attorney of record for and on behalf of Ms. Dougherty–Trentlage and in substitution for attorney Robert E. Ray in the post-dissolution proceedings.

119. The respondent's motion for mediation and the respondent's response to verified motion for modification and enforcement of parenting time and child support issues were filed with the Weld County District Court on February 6, 2001.

120. On February 9, 2001, the court granted the motion for mediation and ordered the parties to engage in mediation prior to setting any court hearing in the matter.

121. In February 2001, the respondent informed his client that he was either going to a seminar on QDROs or was doing further research on the topic, and would then finish her QDRO. The respondent's billing records demonstrate that Ms. Dougherty–Trentlage had a $170 balance on her retainer as of March 1, 2001.

122. Ms. Dougherty–Trentlage and her ex-husband attended mediation on Tuesday, March 20, 2001. The parties resolved par-

enting time, child support and medical costs; some issues involving finances and traveling with the children remained. The certificate of completion of mediation was filed by the mediator on March 23, 2001.

123. On March 26, 2001, the respondent paid Ms. Dougherty–Trentlage's portion of the mediation bill in the amount of $128.75 from his office operating account. The respondent had sufficient funds in the trust account on behalf of Ms. Dougherty–Trentlage to pay this amount.

124. In March and April, 2001, Ms. Dougherty–Trentlage continued to contact the respondent to determine the status of the QDRO. The respondent continued to state that he was working on the matter.

125. On May 1, 2001, the respondent had another office conference with the client, the ex-husband and the ex-husband's attorney. The status of the QDRO was discussed. The respondent stated that he was finishing the QDRO.

126. The respondent did not finish the QDRO as promised on May 1, 2001, however, and did not submit the same to opposing counsel. The respondent states he submitted a bill to his client for the amount of $318.75 on May 6, 2001. The client states she never received this May 6, 2001 bill.

127. On June 14, 2001 the respondent had another office conference with the client. At that time, Ms. Dougherty–Trentlage again inquired as to the status of the QDRO. Respondent stated that he was working on it.

128. The respondent prepared a June 15, 2001 memorandum; the last item in that memo stated as a reminder to himself "Finish the damn QDRO." The respondent prepared the memorandum following the meeting with his client.

129. On July 4, 2001, the respondent submitted another bill to Ms. Dougherty–Trentlage. While the billing states that the June 14 conference lasted .8 hours (and therefore an additional $120.00 was owed), the "total due" remained at $318.75.

130. Ms. Dougherty–Trentlage did not pay the $318.75 when she received the July 2001 billing statement because the respon-

dent had not yet completed his job. At that time, Ms. Dougherty–Trentlage felt frustrated at waiting two and a half years to get the QDRO complete.

131. The respondent has alleged that he refused to work on the QDRO after July 2001 due to his client's failure to pay his $318.75 bill. The respondent admits, however, that he did not inform his client that he refused to work on her matter unless she made further payment. The respondent remained counsel of record and had a continuing obligation to complete his professional tasks.

132. The respondent 'did no further work on Ms. Dougherty–Trentlage's matter.

133. On September 6, 2001 opposing counsel wrote to the respondent and stated:

I know you were going to prepare a QDRO, but since it was supposed to be done within ninety days of the decree pursuant to statute I am curious how we are going to accomplish it at this late date. Mr. Dougherty has informed me that he will just accept the present court ordered parenting time and does not wish to pursue the motion to modify at this time. Are there any matters your client wishes to pursue other than the QDRO?

Your response within ten days would be greatly appreciated.

134. The respondent received the September 6, 2001 letter. Nevertheless, the respondent did not respond to attorney Rawling's request for information on the QDRO, and failed to finish the QDRO.

135. On December 26, 2001 Ms. Dougherty–Trentlage filed a request for investigation against the respondent in this matter.

136. On February 21, 2002 the respondent filed his response to the request for investigation. In that response, the respondent states:

"I have reviewed the request for investigation filed by Tracy Dougherty–Trentlage. She completely omits the crucial fact that she has failed to pay me for past fees and costs, including an advance paid by me of $128.75 to the mediator. Since I do not

intend to work for free, I refused to do any further work until my past due bill was paid, and reasonable retainer was paid for future work.

\* \* \*

If I had been paid, I could have finished the QDRO in about one more hour of work."

137. Contrary to the respondent's February 21, 2002 statements, there were sufficient funds in the trust account to pay the March, 2001 mediator bill. There were also sufficient funds in the trust account in February 2001 for the respondent to complete the QDRO in one hour's time (the respondent's billed hourly rate was $150). The respondent nevertheless failed to finish the QDRO.

### CLAIM IX

**(A Lawyer Shall Act With Reasonable Diligence And Promptness In Representing A Client And Shall Not Neglect A Legal Matter Entrusted To That Lawyer–Colo. RPC 1.3)**

138. Paragraphs 108 through 137 are incorporated herein as if fully set forth.

139. Colo. RPC 1.3 provides that a lawyer shall act with reasonable diligence and promptness in representing a client, and that a lawyer shall not neglect a legal matter entrusted to that lawyer.

140. The respondent failed to act with reasonable diligence and promptness and neglected Ms. Dougherty–Trentlage's legal matter by failing to prepare the QDRO on behalf of his client, or otherwise notify the client that he would not finish this professional task.

141. The respondent knew or should have known that his lack of diligence and promptness, and/or neglect continued to occur over a period of months and involved a pattern and practice of lack of diligence and promptness, and/or neglect.

142. The respondent's lack of diligence and promptness, and/or neglect caused injury or potential injury to the client.

143. The foregoing conduct of the respondent establishes grounds for discipline as

provided in C.R.C.P. 251.5, and also violates Colo. RPC 1.3.

WHEREFORE, the complainant prays at the conclusion hereof.

## VI. CLAIM X

### (A Lawyer Shall Keep A Client Reasonably Informed About The Status Of A Matter, and Promptly Comply With Reasonable Requests For Information– Colo. RPC 1.4(a))

144. Paragraphs 108 through 137 are incorporated herein as if fully set forth.

145. Colo. RPC 1.4(a) provides that a lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

146. This respondent failed to keep the client reasonably informed about the status of the legal matter and failed to comply promptly with reasonable requests for information by failing to advise Ms. Dougherty–Trentlage that he would not handle her legal matter in a timely fashion, particularly after he decided that he would not finish such matter.

147. At a minimum, the respondent had the duty to notify his client in July, 2001, that he would not perform any further services on her behalf until and unless she made further payment to him.

148. The respondent knew or should have known that he had failed to communicate adequately with his client over an extended period of months.

149. The respondent's pattern and practice of failing to communicate with the client caused injury or potential injury.

150. The foregoing conduct of the respondent establishes grounds for discipline as provide for in C.R.P.C. 251.5 and violates Colo. RPC 1.4(a).

WHEREFORE, it is prayed that the respondent be found guilty of violations of various rules of conduct which establish grounds for discipline as provided in C.R.C.P. 251.5, and the Colorado Rules of Professional Con-duct as specified above and that he be appropriately disciplined and assessed the costs of these proceedings.

James C. Coyle, # 14970
Deputy Regulation Counsel
John S. Gleason, # 15011
Regulation Counsel
Attorneys for Complainant

